IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| STEPHEN CLAYTON REEVES, ) | Case No. 04-21968-7-drd |
| ) | |
| Debtor. ) | |

## **MEMORANDUM OPINION**

The matter before the Court in this case is the motion to dismiss filed by the United States Trustee ("UST") pursuant to 11 U.S.C. § 707(b). The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1). This is a core proceeding which this Court may hear and determine, pursuant to 28 U.S.C. § 157(b)(2)(A). Based upon an analysis of Debtor's tax returns and pay statements, the UST argues that Debtor's income, and that of his spouse, which the UST claims must be considered in the analysis, was significantly under-reported in the Debtor's schedules of income and expenses. The UST contends that an accurate analysis of the Debtor's income and expenses reflects net income sufficient to make a substantial effort at repaying Debtor's creditors. Debtor contends that if the income of his spouse is to be considered at all, it should be considered only to the extent that it contributes to her fair share of the household expenses. Debtor also contends that the income levels reflected in the UST's analysis assume a level of hours worked which neither the Debtor nor his spouse will be able to sustain and that properly considered, the net household income is insufficient to pay the recurring expenses let alone make any significant payment on the Debtor's liabilities under a Chapter 13 plan. The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, the Court grants the UST's motion to dismiss

the case pursuant to § 707(b).

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 13, 2004, Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code. Debtor's Schedule I, the schedule of current income, reflected gross monthly wages of $3,212.04 with net pay of $1,923.38 per month. His spouse, Donna Dorman, was shown as earning gross monthly income of $4,333.30 with a monthly take-home pay of $2,807.43, resulting in a combined net monthly income of $4,730.81. Schedule J, the schedule of current expenditures, showed monthly household expenses of $4,788.15. Included among those expenses were monthly payments of $560.00 on a debt secured by a home owned solely by Ms. Dorman and $71.00 per month in utilities to maintain that home. The home is neither occupied by the Debtor and his spouse nor rented. These original schedules have never been amended.

The UST's financial analyst, John Church, testified that after examining tax returns and actual pay statements for the Debtor and his spouse, both for the period immediately prior to the filing of the petition and for the year 2005 to a point several weeks prior to the date of the hearing on the motion, the household's disposable income was significantly in excess of that reported by the Debtor on the schedules. According to that analysis,[1] Debtor's average monthly gross pay was $4,845.00, $1,632.96 more than that reported on the schedules. The net pay, after deductions for taxes, insurances and a garnishment for child support was $3,503.89 or $1,580.51 more than reported on Schedule I. That analysis also shows an under-reporting of the income of Ms. Dorman, although less

---

[1]Movant's Ex. 1.

significant. The UST's analysis suggests average monthly gross income of $5,066.80, $733.47 more than reported on the schedules and net monthly pay of $2,991.69, $184.26 more than reported on the schedules. According to the UST's analysis, the household's net average monthly income is $6,495.58. After adjusting the scheduled expenses by adding the sum of $366.00 as an additional amount of child support which Debtor may be obligated to pay as a result of a pending motion, and deducting the $631.00 paid on the vacant home for debt service and utilities, the UST calculates that the household has approximately $1,972.43 in disposable income with which to make payments under a hypothetical Chapter 13 plan. Assuming a trustee fee of 5.4% of the gross payments, the amount available over a 36-month period is calculated to be $67,173.00, which would produce a 47.4% dividend on unsecured debt, reflected on Debtor's Schedule F as being $141,751.00.

Debtor and his spouse are both employed at the University of Missouri Hospital in Columbia. Debtor works as a registered nurse and is paid $22.11 per hour.[2] He testified he is presently working 36 hours per week, but produced no pay statements to support that contention. His estimate of his current average gross monthly income is $3,449.16.[3] After deduction of payroll taxes, social security, insurance, a parking fee and child support (including an additional amount for an anticipated increase) his net monthly income is $1,223.21. His wife, also a registered nurse, is paid $26.34 an hour and is presently working 40 hours a week, generating average gross monthly income of $4,565.60. After deductions for taxes, insurance and parking, her net average monthly income is $2,603.34, making the projected average net monthly household income $3,826.55.

---

[2]Respondent's Ex. 7.

[3]Respondent's Ex. 15.

Debtor married his current wife on May 1, 2004, a little more than two months before filing this Chapter 7 case. On February 25, 2005, Ms. Dorman gave birth to a son. Although Ms. Dorman had originally contemplated remaining home to care for her son or working part-time, she has apparently, after determining that would have an adverse impact on her tenure at work and therefore certain benefits, changed her mind and decided to return to work on a full-time basis. According to Debtor's testimony, he and his wife have arranged childcare for their son and have staggered their workdays so that Debtor can stay home with him on certain days. Debtor apparently works three 12-hour shifts a week. His wife works two 12-hour shifts and two 8-hour shifts.

Debtor testified that all the debts listed in the schedules are his, some of which are rooted in his previous marriage. He has two daughters by his previous marriage for one of whom he has a child support obligation, paying approximately $225.00 a month. Debtor's ex-spouse is apparently seeking to increase that child support. Although Debtor is resisting that request, he testified that if the request is granted, based upon Missouri child support guidelines, he anticipates being required to pay an additional $366.00 a month for a total monthly child support payment of $591.00.

On the expense side, Debtor itemized projected household monthly expenditures totaling $5,001.66.[4] That sum includes a $560.00 per month mortgage payment on the residence owned by his spouse, as well as $71.00 in monthly utility payments for that property. It also includes anticipated additional payments for automobile insurance for one of Debtor's daughters in the amount of $213.00.

Debtor argues, based on his analysis of the net, monthly household income and monthly

---

[4]Respondent's Ex. 15.

4

expenses, that even if the Court pools his income with that of his spouse's, and considers his spouse's expenses as those of the household's, that there still exists an insufficient surplus of disposable income to fund a Chapter 13 Plan. Alternatively, Debtor contends that the Court should not consolidate the income and expenses to assess Debtor's ability to fund a Chapter 13 plan. Debtor contends that the Court should look solely at his income, allocate the monthly household expenses between him and his spouse and consider his spouse's income only to the extent that it is necessary to defray her share of those expenses. In support of that approach, Debtor submitted projections of monthly income and expenses which allocate to him $2,229.33 of the projected monthly average household expenses of $5,001.66.[5] Based upon this evidence, Debtor contends that his projected disposable income is actually a negative $1,006.12, considering that his projected average monthly take home pay is only $1,223.21. The Debtor therefore contends that he lacks, under either scenario, the ability to fund a Chapter 13 plan.

## II. DISCUSSION AND ANALYSIS

### A. General Standards

Dismissal for substantial abuse is governed by 11 U.S.C. § 707(b) which provides in part:

(b) After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee, but not at the request or suggestion or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the

---

[5] Respondent's Ex. 16.

provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

In order to prevail on a motion to dismiss for "substantial abuse" pursuant to § 707(b), the UST must demonstrate that the debtor's debts are primarily consumer debts and that the granting of relief would be a substantial abuse of the provisions of Chapter 7. *In re Praleikas*, 248 B.R. 140, 143 (Bankr. W.D. Mo. 2000). Because a presumption exists in favor of granting relief to a debtor, the burden of proof is on the UST to show that a debtor's case should be dismissed pursuant to § 707(b). *In re Regan*, 269 B.R. 693, 696 (Bankr. W.D. Mo. 2001). In this case, there is no question that Debtor's debts are primarily consumer debts. The issue is whether, under the circumstances, the granting of relief would constitute a substantial abuse.

The phrase "substantial abuse" is not defined in the Bankruptcy Code. The Eighth Circuit has, however, indicated that "a Chapter 7 debtor's ability to fund a Chapter 13 plan is 'the primary factor to be considered in determining whether granting relief would be a substantial abuse.'" *Praleikas*, 248 B.R. at 145 (citing *Stewart v. Koch (In re Koch)*, 109 F.3d 1285, 1286 (8th Cir. 1997)); *see also*, *In re Walton*, 866 F.2d 981, 984-85 (8th Cir. 1989); *In re Bicsak*, 207 B.R. 657, 662 (Bankr. W.D. Mo. 1997); *Regan*, 269 B.R. at 696. While the debtor's future ability to repay is the primary factor to be considered and the starting point for analysis in a § 707(b) case, the court may also take into consideration the debtor's good faith and any unique hardships. *Walton*, 866 F.2d at 983; *In re Scobee*, 269 B.R. 678, 680 (Bankr. W.D. Mo. 2001); *Regan*, 269 B.R. at 699.

The primary issue in this case is how and to what extent to consider the income of Debtor's new spouse in performing the substantial abuse analysis. A secondary issue the Court must consider is

6

at what level to project the household income given the history of substantial overtime hours worked by Debtor and his spouse in the recent past as reflected by their pay statements and income tax returns.[6]

### B. Inclusion of Income of Non-Filing Spouse

The majority of the courts that have considered the issue have held that it is not only appropriate but necessary for the court to take into consideration the income of a non-filing spouse in determining whether granting relief to a debtor under Chapter 7 would constitute a substantial abuse. *In re Schmonsees*, 2001 WL 1699664 (Bankr. M.D.N.C. 2001); *In re Engskow*, 247 B.R. 314, 316 (Bankr. M.D. Fla. 2000); *In re Dempton*, 182 B.R. 38, 39 (Bankr. W.D. Mo. 1995) (child support payment received by non-debtor spouse included in income analysis); *In re Messenger*, 178 B.R. 145, 149 (Bankr. N.D. Ohio 1995). Perhaps the principal reason the courts have employed this approach is that in making the substantial abuse determination, the court primarily considers the extent to which unsecured claims could be paid by the debtor in a hypothetical Chapter 13 case and the courts have routinely considered the income and expense of the non-filing spouse in such cases. *In re Strong*, 84 B.R. 541, 543 (Bankr. N.D. Ind. 1988) ("The importance accorded the income and expenses of a non-petitioning spouse in substantial abuse cases should be similar to the significance given this same factor in considering Chapter 13 plan confirmations and the undue hardship discharge of student loans. In Chapter 13 cases where a married debtor files a single petition, courts commonly consider the debtor's income from all sources, including a non-debtor spouse, when assessing compliance with the plan confirmation requirements of 11 U.S.C. § 1325.")

---

[6] Movant's Ex. 3 and 4.

In a Chapter 13 case, if the trustee or an unsecured creditor objects, the plan may not be confirmed unless the debtor is, for a period of three years, committing all of his disposable income to make payments under the plan. 11 U.S.C. § 1325(b)(1). Disposable income includes income received by the debtor and not reasonably necessary for the support of the debtor and his dependents. 11 U.S.C. § 1325(b)(2). As noted, the majority of courts that have considered the issue have held that the court must consider the income of a non-debtor spouse in determining the debtor's disposable income. *In re Bottelberghe*, 253 B.R. 256, 262 (Bankr. D. Minn. 2000); *In re Bottorff*, 232 B.R. 171, 173 (Bankr. W.D. Mo. 1999); *see also*, *In re McNichols*, 249 B.R. 160, 170 (Bankr. N.D. Ill. 2000); *In re Ehret*, 238 B.R. 85, 88 (Bankr. D.N.J. 1999); *In re Cardillo*, 170 B.R. 490, 492 (Bankr. D.N.H. 1994); *In re Saunders*, 60 B.R. 187, 187-88 (Bankr. N.D. Ohio 1986); *In re Kern*, 40 B.R. 26, 28-29 (Bankr. S.D.N.Y. 1984). In doing so, the courts typically calculate the debtor's disposable income based on the family budget including the income and expenses of the non-debtor spouse. *In re Carter*, 205 B.R. 733, 735 (Bankr. E.D. Pa. 1996); *In re Pickering*, 195 B.R. 759, 762 (Bankr. D. Mont. 1996); *Cardillo*, 170 B.R. at 491; *In re Belt*, 106 B.R. 553, 561-63 (Bankr. N.D. Ind. 1989); *In re Carbajal*, 73 B.R. 446 (Bankr. S.D. Fla.); *Saunders*, 60 B.R. at 188; *Kern*, 40 B.R. at 28-29. Inclusion of the income of the non-debtor spouse is considered necessary in order to derive an accurate picture of the debtor's disposable income for the reason that some portion of it is likely to be applied to household expenses, thereby affecting the share of the debtor's income required for support. *Carter,* 205 B.R. at 736. This approach also recognizes the reality that most married couples live as a unit, pooling their income and expenses and that unless spouses maintain separate finances, a portion of the non-filing spouse's income is available to defray the debtor's expenses.

8

*Bottelberghe*, 253 B.R. at 262; *Carter*, 205 B.R. at 736. In addition, Federal Rule of Bankruptcy Procedure 1007(b)(1) requires the use of the Official Bankruptcy Forms and Official Form No. 6, which includes Schedules I and J (schedules of current income and expenses), reflects this approach by requiring a married debtor in a Chapter 13 case to disclose the income and expenses of both the debtor and his or her non-filing spouse. *Bottelberghe*, 253 B.R. at 262; *Carter*, 205 B.R. at 736; *Saunders*, 60 B.R. at 187. Finally, consideration of the income of the non-debtor spouse facilitates the prevention of abuse that might occur in situations in which a non-debtor spouse with income spends it on unreasonable or unnecessary items, unfairly burdening the debtor's income with the ordinary household expenses, thus reducing disposable income and prejudicing the debtor's creditors. *See McNichols*, 249 B.R. at 171; *Kern*, 40 B.R. at 28-29.

Debtor seems not so much to deny that his spouse's income should be considered as to suggest that the household income and expenses should not be pooled in arriving at the income available to Debtor to fund a hypothetical Chapter 13 plan. Relying on an unpublished decision of Judge Koger in *In re Doran*, (Case No. 97-21592, May 19, 1998), Debtor asks the Court to look only at his income and to allocate to his spouse her "fair share" of the household expenses with the remainder of the expenses to be deducted from Debtor's income. The resulting balance would constitute the disposable income available to Debtor to make plan payments in a Chapter 13 case. His spouse's income would thus be considered only to the extent it pays the determined allocable share of the household expenses. Debtor argues that the pooling approach is unfair to a non-filing spouse, especially in a case like this one in which all of the scheduled debts are obligations on which his spouse has no personal liability. Debtor suggests his spouse may chafe at the prospect of contributing some portion of her income to the

9

payment of his creditors and that this situation may place undue stress on the marital relationship.  The approach suggested by Debtor and reflected in Judge Koger's analysis in *Doran* was apparently formulated for the purpose of simultaneously addressing the abuse concerns inherent in any approach that would fail to take into consideration the income of the non-filing spouse while alleviating the impact of compelling the non-debtor spouse to pay the debtor's creditors.

Reasonable arguments can be made in favor of either approach and each is vulnerable to certain objections.  Because, however, this Court concludes that it would reach the same decision employing either model, it need not decide the question in this case.[7]  Before illustrating why this is the case, however, the Court needs to decide a threshold question:  at what level to project the income of Debtor and his spouse.

### C.  Income Determination and Inclusion of Overtime

Debtor's projection of income includes his spouse at a full-time 40 hours per week, but shows his income cut back to 36 hours per week.  The UST responds that an analysis of the couple's pay statements show that both worked considerable overtime in the previous year and in 2005 to date and that this should be considered in projecting income for purposes of the substantial abuse analysis.

---

[7]This issue may be rendered moot for cases filed on and after October 17, 2005, pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  The amendments to § 707(b), which establish the new means test to be used to judge the eligibility of debtors filing for relief under Chapter 7 require the Court to examine the debtor's "current monthly income", a term which is defined to include the income that the debtor's spouse receives only in a joint case.  11 U.S.C. § 101(10A)(A), added by BAPCPA of 2005.  A recent commentary on the amendments suggests "a question that exists under this definition is whether the income of the debtor's spouse should be considered at all in an abuse analysis unless it is a joint case.  Under former law, the income of the debtor's spouse was often a part of the substantial abuse analysis, even though only one debtor filed for bankruptcy relief.  The fact that the definition looks to the spouse's income only for joint cases will perhaps permit some individual consumer debtors to qualify for Chapter 7 relief if they do not file jointly with their spouse."  W. Brown and L. Ahern, *2005 Bankruptcy Reform Legislation With Analysis*, p. 25 (West 2005).

Debtor contends that, for a variety of reasons, it should not be assumed that he and his wife will be able to continue to do so.

The Court's own research has revealed very few cases discussing how overtime should be treated in this analysis. *See In re Harger*, 267 B.R. 848, 852 (Bankr. N.D. Iowa 2001)(§ 707(b) motion sustained based upon current income figures, despite debtor's protestation that income projections were based upon substantial overtime which might become unavailable due to alternative work schedule); *In re Laury-Norvell*, 157 B.R. 14, 17 (Bankr. N.D. Ohio 1993) (§ 707(b) motion denied based upon debtor's testimony regarding inability to continue to work overtime for health reasons). In this case, and in future matters in which a debtor has a documented history of working overtime, the Court will take that into consideration in projecting income unless the debtor demonstrates that there is some reason that a similar level of overtime work will not be available to the debtor (such as, for example, a change in the employer's business or policies) or the debtor will not be able to take advantage of the available overtime (such as, for example, for medical reasons). While this Court does not believe it appropriate to compel debtors to work overtime, it does believe that in projecting income, it is appropriate to assume that the past is prologue to the future unless it can be demonstrated that there has been or will be a change in circumstances beyond the debtors' ability to control. Any other approach would invite abuse. Because the Court finds in this case that Debtor and his spouse have consistently worked overtime and is not persuaded by Debtor's arguments that that cannot or will not continue, the Court will use the income figures contained in the UST's analysis as a starting point in projecting disposable income.

While there is some discrepancy in the income figures projected for Ms. Dorman by Debtor

11

and the UST[8], the significant difference lies in the estimates of projected income from Debtor. Based upon a 36-hour work week, Debtor projects gross monthly income of $3,449.16 and net pay (after deducting, among other things, an anticipated additional amount of child support) of $1,223.21. The UST's figures are $4,845.00 and $3,503.89, respectively (without the additional child support).

Debtor offers several reasons why he cannot achieve the level of income projected by the UST. In an apparent attempt to convince the Court that overtime may no longer be available from his employer, Debtor testified that the availability of overtime depends upon the patient census at the University of Missouri hospital at which he works. He did not, however, offer any evidence that the patient census was likely to be significantly different in the future than it had been in the past, during which period overtime opportunities were apparently plentiful for Debtor. Accordingly, Debtor has offered no evidence which would permit the Court to conclude that overtime opportunities will not be available to him.

Debtor also testified about numerous medical problems with which he is afflicted and the medications and treatments that have been prescribed for them. These conditions, however, have been a part of his health picture for several years and did not prevent him from working considerable overtime in 2004 and in the early part of 2005. Although he apparently would like the Court to

---

[8]The UST's analysis of Ms. Dorman's income in the year 2005 to date indicates that her average monthly gross income has been $5,066.80 with average monthly net pay of $2,991.69. The scheduled amounts for her are $4,333.33 and $2,807.43, respectively. The difference in net pay is only $184.26 a month. Debtor projects future income for his spouse in the average gross monthly amount of $4,565.60 with a net average monthly pay of $2,603.34. The UST's analysis is based upon pay statements for Ms. Dorman for the period through March 23, 2005. While Ms. Dorman apparently initially intended not to return to work after the birth of her child, a decision which both the UST and this Court would likely have respected, she has apparently since changed her mind after being advised that she would lose tenure and with it certain employment benefits. While there are differences in the parties' calculation of projected net income for Ms. Dorman, they are nowhere near as substantial as the difference that exists with regard to the same calculations regarding Debtor.

conclude that his proposed cutback in hours is supported in part by these problems, no medical testimony or other evidence was presented establishing that they would prevent him from working on a full-time basis or that they make it impossible or even difficult to work the same amount of overtime as he had in the past. Debtor did not even himself testify to this effect.   Debtor's wife gave birth to a son in late February. The Court understands that this event has changed Debtor's situation in certain ways. Debtor argues that changes in schedules necessitated by the birth of his son and limits on the availability of childcare make working overtime impractical. However, as the UST points out, pay statements dated as recently as May 4, 2005 (for the pay period ended April 23, 2005) show that Debtor continues to work substantial overtime. As of the date of the hearing, which occurred less than three weeks after the date of this pay statement, Debtor was unable to demonstrate that he had in fact implemented his proposed cutback in hours. Moreover, while Debtor's testimony establishes what the work plan and childcare arrangements are, it fails to establish that they cannot be otherwise and that they necessarily prevent the Debtor from working overtime. Because the evidence establishes that even two months after the birth of his son Debtor continued to work and be compensated for significant overtime, the Court grants little credence to Debtor's argument that the couple's schedules and childcare arrangements limit his ability to work overtime.

### D. Disposable Income and Ability to Pay

With the exception of disputing the reasonableness of the expenses attributable to Ms. Dorman's property, the UST has raised few questions about the household's actual or projected expenses. When Debtor filed his Schedule J, the household expenses were estimated to be $4,788.15 per month. Debtor's trial evidence places them at $5,001.66. Some have increased; others have

declined. Some categories are new. Even using Debtor's expense estimates, including the contested expenses for debt service and utilities on his spouse's vacant residential property, at the income levels calculated by the UST, the Court finds that this case would be a substantial abuse, regardless of whether the Court pools the income and expenses of the debtor and his spouse or employs the "fair share" approach urged by Debtor.

Using the approach which combines income and expenses to arrive at a household budget, the Court concludes that Debtor has substantial disposable income with which to fund a Chapter 13 plan. According to the UST's calculations, Debtor's net monthly income is $3,503.89 and that of his spouse is $2,991.69 for a joint monthly household income of $6,495.58. Using Debtor's trial evidence, the household's expenses are $5,001.66 leaving monthly disposable income of $1,493.92. Over a period of 36 months, that income would permit plan payments in the aggregate amount of $53,781.12. Assuming a trustee fee of $2,904.18 (calculated at 5.4% of gross plan payments), unsecured creditors would receive payments of approximately $50,876.94 or 35.9% of their claims. Utilizing Debtor's approach, the result is not materially different. The starting point is Debtor's net monthly income of $3,503.89. According to Debtor's exhibits, the expenses fairly attributed to him are $2,293.33, leaving a disposable income of $1,274.56. Monthly payments in that amount for a period of 36 months would produce $45,884.16. Deducting a trustee fee of $2,777.74 (5.4% of gross plan payments) yields a net payment to unsecured creditors of $43,406.42 which would be 30.6% of their claims.

Neither of these calculations includes the additional child support Debtor believes he may have to pay commencing sometime later this year. At present, Debtor pays $225.01 per month for the support of one of his daughters by a prior marriage. As a result of a change in living arrangements,

Debtor is now the subject of a motion by his ex-spouse, set for hearing sometime this month, to increase the child support by $366 a month for a total monthly child support payment of $591. Debtor is apparently contesting that motion. This estimate was made based upon the appropriate Missouri rules and forms for calculation of child support amounts. There was, however, no testimony from which the Court could assess the probability that Debtor will be required to pay this additional amount. As mentioned, Debtor is apparently contesting the motion although the evidence does not reveal the factual and legal basis for the motion or Debtor's opposition. Accordingly, this expense item is somewhat speculative. However, the inclusion of this additional amount does not materially change the analysis or affect the Court's ultimate conclusion. Once again, employing first the approach of combining the income and expenses of Debtor and his spouse, the dividend on unsecured claims declines from 36% to 27.1%.[9] Employing Debtor's "fair share" analysis, the dividend declines from 30.6% to 21.8%.[10] In the Court's view, a dividend to unsecured creditors in any of these amounts represents a substantial effort to pay Debtor's unsecured claims and warrants a finding that granting Chapter 7 relief to Debtor would be a substantial abuse of the provisions of the Bankruptcy Code. *See, e.g., Regan*, 269 B.R. at 698 (29%); *Praleikas*, 248 B.R. at 145 (20%).

It should be noted that this analysis takes Debtor's expenses at face value and therefore gives Debtor the benefit of the doubt as to the necessity and reasonableness of each of the listed expenses.

---

[9] Deducting an additional $366.00 from the household's previously determined disposable income yields $1,127.92, which, paid over 36 months, would accumulate to $40,605.12. Deducting a trustee fee of $2,192.68 (5.4% of the gross plan payments) yields $36,219.76 which produces a dividend of 27.1%.

[10] The previously calculated disposable income utilizing the debtor's "fair share" approach was $1,274.56. Deducting the additional child support payment of $366.00 produces a monthly payment of $908.56. Paid for 36 months, this would produce gross plan payments of $32,708.16. Deducting a trustee fee of $1,766.24 (again, 5.4% of gross plan payments) produces total plan payments of $30,941.92 or a dividend for secured creditors of 21.8%.

Much was made at the hearing of the expenses related to Ms. Dorman's residential real estate. She owns a home which is unoccupied and produces no income. At the same time, the household continues to make a monthly debt service payment and pays the utilities on the home. The UST objected to the reasonableness of such a payment and suggests that it be included in Debtor's disposable income. Debtor objected that including those sums in his disposable income would cause his spouse to sell the property or lose it to foreclosure, a result which he urges is unfair and unreasonable and asserts she is unwilling to suffer. Given the approach the Court has adopted with respect to the inclusion of her income, the issue becomes moot. Clearly, however, on the pooled income approach, the Court would disallow the debt service and utility expenses on this piece of real estate which the household does not need or use and which produces no income, but drains the household budget by a significant amount each month. Inclusion of this figure in Debtor's disposable income would strengthen the case for finding that the filing is a substantial abuse.

Finally, while the Court might expect that the budgeted expenses of a debtor seeking relief under the Bankruptcy Code would reflect some belt tightening – some reduction from prepetition levels, *see, e.g.*, *In re Smith*, 269 B.R. 686, 692 (Bankr. W.D. Mo. 2001) – that is not the case here. For example, the household spends $72 each month for cable television, which the Court hardly regards as a necessity. The revised income and expenses figures presented by Debtor at trial were obviously designed to convince the Court that Debtor cannot afford to make Chapter 13 plan payments of any substantial amount. It seems to the Court, however, that Debtor's evidence proves too much and that the figures lose credibility in the process. Debtor would have the Court believe that the household's net monthly income is or will be $3,826.55 and its combined expenses are or soon will be $5,001.66. It

16

does not take a mathematical genius to understand that no household can operate on these numbers for long, if at all. Unless Debtor is printing money in his basement, plans to liquidate assets not shown on the schedules, or has other sources of income not reflected on the schedules, the household has not been paying and cannot pay monthly expenses in excess of $5,000 with less than $4,000 in monthly net income. The Court can only conclude that the household has more income than projected, less expenses or both. As a result, the Court does not find Debtor's estimates of projected income and expenses to be credible.

### E. Other Factors

The Court's ultimate conclusion in this matter is affected by one other factor. Based on the information supplied by the UST drawn from Debtor's pay statements and tax returns, it appears to the Court that Debtor significantly under-reported his income at the time he filed his petition and accompanying schedules. Schedule I shows gross monthly income of $3,212.04 and net pay of $1,923.38 per month. After analyzing the documents supplied by Debtor relating to his compensation, and factoring in the substantial overtime reflected there, the UST calculated Debtor's actual average monthly gross income to be $4,845.00, with a net monthly income of $3,502.89. The difference in net income, the extent to which Debtor under-reported his actual income, is $1,580.51 per month.[11]

As noted above, one of the things the Court may take into consideration in making the

---

[11] While the UST's figures quoted here are based on an examination of pay statements from the year 2005 to date, not the period immediately prior to the filing of the petition, a similar analysis was apparently performed on those statements and yields a similar result. The UST's financial analyst testified that his examination of the documents provided by Debtor on income for the year 2005 to date suggests an annual combined gross pay of approximately $118,942.00. An examination of pay statements produced for the period in 2004 shortly prior to the filing of the petition suggested annual combined gross income of approximately $117,000.00.

substantial abuse analysis is the debtor's good faith.  A significant under-reporting of income for which no explanation is offered, presents evidence of lack of good faith.  While this Court might not, standing alone, find a dividend in the range suggested by the calculations set forth above to be indicative of substantial abuse, it does so in this case, where the dividend is coupled with Debtor's failure to be forthcoming regarding his actual monthly income.

For all of the reasons stated above, the Court will grant the UST's motion to dismiss the case unless the Debtor chooses, within 20 days of the date of this Order, to convert the case to Chapter 13.

A separate Order will be entered as required by Rule 9021.

ENTERED this 15th day of July 2005.

/s/ Dennis R. Dow
THE HONORABLE DENNIS R. DOW
UNITED STATES BANKRUPTCY JUDGE

Copies to:
Harry D. Boul
Sherri L. Wattenbarger